**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NISSAN MOTOR ACCEPTANCE CORP.** | : | CIVIL ACTION |
| | : | |
| **v.** | : | NO.  18-5451 |
| | : | |
| **SPORTS CAR LEASING LLC** | : | |

**<u>MEMORANDUM</u>**

**SCHMEHL, J.    /s/ JLS**                                    **March 29, 2021**


         Plaintiff Nissan Motor Acceptance Corporation ("Nissan" or "NMAC") brought this

action to enforce its perfected security interest in certain vehicles purchased by

Defendant Sports Car Leasing LLC ("Sports Car Leasing") from three Nissan

dealerships in New Jersey and, for such vehicles Sports Car Leasing has already sold,

its security interest in the proceeds of such sales. In its Amended Complaint, Nissan

asserts claims for replevin (Count One), declaratory judgment (Count Two) and

conversion (Count Three). Nissan seeks a Writ of Replevin, declaratory judgment as

well as compensatory and punitive damages. Presently before the Court is Nissan's

motion for summary judgment. For the reasons that follow, the Court will deny Nissan's

motion and, because the Court agrees with Nissan that there are no material facts in

dispute, invites Sports Car Leasing to file a motion for summary judgment.

         A court shall grant a motion for summary judgment "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a

sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-

moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id. (citing *Anderson*, 477 U.S. at 248).

Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. See *Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The following facts are either stipulated to by the parties ("SOF") or otherwise not in dispute[1]:

1.  NMAC provides wholesale credit lines and purchase money financing to authorized Nissan and Infiniti dealers across the country. (SOF ¶ 1, ECF 68-4.)

2.  These financing arrangements – called "floor plan" financing in the automotive industry – enable authorized dealers to acquire in-store vehicle inventory for retail sale. (SOF ¶ 2.)

3.  Between 2007 and 2018, NMAC extended floor plan financing to three related authorized dealers, Infiniti of Englewood, LLC d/b/a Nissan of Englewood, Nissan of Hawthorne LLC d/b/a Nissan of Hawthorne, and Elite Nissan of Bergenfield LLC d/b/a Elite Nissan of Bergenfield

---

[1] In support of its Opposition to Nissan's motion for summary judgment, Sports Car Leasing has included a "supplemented record" that seeks to introduce new evidence that Sports Car Leasing contends is relevant to these proceedings. This new evidence was apparently not provided as part of Sports Car Leasing's initial disclosures or in response to discovery requests, and only was provided to Nissan after Nissan filed for summary judgment. Such evidence includes: the Affidavit of Gary V. Cohen (ECF 71-1); the Affidavit of Michael P. Fleisher, Sr. (ECF 71-2), as well as documents attached as exhibits which were not produced in discovery; the Affidavit of Ralph Pindek (Exhibit 7); the Affidavit of Ralph Pindek in connection with the New Jersey Litigation (ECF 71-8), as well as documents attached as exhibits which were not produced in discovery; the Affidavit of Craig Heller (ECF 71-9); correspondence between counsel for Sports Car Leasing and the court presiding over the New Jersey litigation (ECF 71-10); and the Affidavit of Michael Curry in connection with the New Jersey Litigation (ECF 71-13). The Court agrees with Nissan that since it did not have the opportunity to depose these affiants during the discovery period of this litigation and ask questions about the statements contained in the Affidavits, the Affidavits should be stricken as untimely and prejudicial. If defense counsel wanted these Affidavits to be part of the record, he should have produced them long before the discovery period ended and the date dispositive motions were due, April 30, 2020. (EFC 60.) In addition, the Affidavits of Ralph Pindek and Craig Heller were sworn to after each had had his deposition taken by Plaintiff. While the Court does not believe the contents of these affidavits contradicts their deposition testimony for purposes of the sham affidavit rule, the Court does note that the contents do, at the very least, embellish on their deposition testimony further prejudicing the Plaintiff.

(collectively, the "Dealerships"). (Amended Complaint ECF 21, Ex. A-C.)

4. The floor plan financing arrangements were memorialized in Automotive Wholesale Finance and Security Agreements (the "WSAs"). Pursuant to the WSAs, NMAC extended more than $43 million in credit to the Dealerships (the "Loans"). (ECF 21 at ¶ 14, 15 Ex. A-C.) The Dealerships used the Loans to acquire new vehicle inventory from global automotive manufacturer Nissan North America ("NNA"). (ECF 21 at ¶ 12, Ex. A-C.)

5. After the Dealerships acquired vehicles under the WSAs, the vehicles would then be delivered to the Dealerships not with a title but instead with a Manufacturer's Statement of Origin ("MSO"). (SOF ¶ 3.) An MSO signifies that a vehicle is new, unused, without a title, and has only been transferred between non-consumer entities such as car dealerships, manufacturers, or financial holding companies. (ECF 21 at ¶ 19, Ex. A-C.)

6. In exchange for receiving floor plan financing from NMAC, the Dealerships granted NMAC continuing senior security interests and liens in the Dealerships' collateral, including each floor planned vehicle held for retail sale (the "Collateral"). (See WSAs at § 2.4, ECF 21, Ex. A-C.)

7. NMAC perfected its security interest and lien in, among other Collateral, each floor planned vehicle by filing UCC-1 Financing Statements. (See UCC-1 Financing Statements, ECF 21 at 21, 29, 37.)

8. Under the WSAs, after a Dealership sells a financed vehicle, it is required to promptly repay the Loan that NMAC advanced for the purchase of that vehicle. (ECF 21, Ex. A-C at § 2.3.2.) Only upon both the sale of a vehicle and repayment of the Loan to NMAC, would NMAC's lien be satisfied, and a Dealership authorized to transfer the vehicle, with title, to a third-party customer. (ECF 21 at ¶ 20.)

9. The Dealerships possessed the floor planned vehicles for the sole purpose of storing and exhibiting them for sale or lease in the ordinary course of the Dealer's business. (ECF 21, Ex. A-C at § 3.1.) NMAC retained ownership of the vehicles until the Dealerships repaid the Loans advanced by NMAC to finance each vehicle. (*Id*.) Only upon NMAC's receipt of repayment of the Loan, but not before, were the Dealerships authorized to transform the MSO of a new vehicle into a title that would allow the vehicle to be directly transferred to a customer. (ECF 21 at ¶ 20.)

10. A Dealership's sale of a vehicle without first repaying the floor plan financing for the vehicle – an express violation of the WSAs – is known in the automotive industry as "selling out of trust" ("SOT"). (*Id*. at ¶ 22.)

11. Following routine on-site audits of the Dealerships and their inventory on December 11, 2018, NMAC discovered that the Dealerships had

sold approximately 745 floor planned vehicles out of trust, resulting in approximately $24.3 million being owed to NMAC. (*Id*. at ¶ 26.) NMAC thereafter declared events of default for, among other things, failing to pay indebtedness when due; breach of warranty, representation, or statement; and failure to allow an audit of financial records. (*Id*. at ¶ 28.)

12. On December 14, 2018, NMAC filed a civil action against the Dealerships, among others, in the United States District Court of New Jersey in *Nissan Motors Acceptance Corporation v. Infiniti of Englewood, LLC, et al.*, Civil Action No. 2:18-cv-17228-MCA-MAH (the "New Jersey litigation").

13. Sports Car Leasing is an automobile wholesaler that specializes in purchasing vehicles at wholesale prices and reselling them to third-party customers. (ECF 21 at ¶ 30; Pindek Dep. ECF 68-8 at 17:6-18:5.)

14. Ralph Pindek ("Pindek") founded Sports Car Leasing in the early 2000s and is a controlling member along with his wife. (SOF ¶ 5.)

15. Pindek has been involved in the automotive business for about thirty years. (SOF ¶ 6.) Sports Car Leasing employs Craig Heller ("Heller") as a commission-based wholesale buyer. (Heller Dep. ECF 68-3 at 9:19-21; 14:6-12.)

16. Heller "grew up in" the auto industry, learning from his father who also was a wholesaler. (SOF ¶ 7.)

17. On average, Sports Car Leasing completes about 1000 vehicle sales per year. (SOF ¶ 8.)

18. According to Pindek, Sports Car Leasing buys vehicles from private individuals, but over the past ten years, it has purchased 90 to 95 percent of its vehicles from dealerships. (Pindek Dep. ECF 68-8 at 17-18.) Heller confirmed that "most of the time" he buys from dealerships. (Heller Dep.ECF 68-3 at 26.)

19. Sports Car Leasing will sometimes purchase anywhere from one, five, ten or "whatever they have to sell" vehicles from dealerships. (Pindek Dep. ECF 68-8 at 28.)

20. According to Pindek, all of the vehicles Sports Car Leasing purchases are pre-owned vehicles. (*Id*. at 29, 30.)

21. According to Pindek, dealerships sometimes need to sell vehicles in groups in order to meet the manufacturer's quotas. (*Id.* at 31.)

22. Sports Car Leasing sells 90 to 95 percent of the vehicles that it purchases through the Manheim Auto Auction ("Manheim"). (Heller Dep. ECF 68-3 at 13.)

23. All of the vehicles Sports Car Leasing buys have either regular or MSO titles. According to Pindek, cars on regular titles can be sold to anyone while cars on MSO titles can only be sold to dealerships. (Pindek Dep., ECF 68-8, at 51.)

24. Sports Car Leasing sells vehicles through Manheim about 80 times per year. (SOF ¶ 10.)

25. It is customary for Sports Car Leasing to inspect all vehicles before purchasing them. (SOF ¶ 11.)

26. The amount of mileage or the chain of ownership of a vehicle is not determinative of whether Sports Car Leasing deems the Vehicles pre-owned; rather, a vehicle is "pre-owned," according to Sports Car Leasing, if the originating or authorized dealership "punches in" the vehicle's information, thereby generating a title and removing the vehicle's MSO. (SOF ¶ 12.)

27. Punching a vehicle allows the Dealership to receive incentive awards from the manufacturer.

28. Sports Car Leasing determines a vehicle's value – and therefore its potential profit on a vehicle – by assessing the Manheim Market Report ("MMR") for the vehicle. (ECF 68-8 at 36:16-18.) MMR value is calculated by taking a rolling average of all sales for a model year vehicle at Manheim within a given year. (*Id*. at 37:7-10); MMR value, however, does not account for variations in a vehicle's condition, mileage, and other factors that are determinative of a vehicle's fair market value. (*Id*. at 37:7-10.)

29. Using MMR as a guide, Sports Car Leasing ultimately determines a vehicle's value based on Pindek's "gut feeling" acquired from his "[y]ears of experience." (SOF ¶ 13.)

30. Typically, after Sports Car Leasing purchases vehicles from a dealership, the vehicles are transported to Pennsylvania for reconditioning. (SOF ¶ 14.)

31. After the vehicles are reconditioned, they are put up for sale at Manheim. (SOF ¶ 15.)

32. Sports Car Leasing began purchasing vehicles from the Dealerships as early as the beginning of 2017 when Gary Cohen ("Cohen"), a general manager at one or more of the Dealerships, contacted Heller. (Pindek Dep., ECF 68-8 at 43, 45.)

33. Between the beginning of 2017 and the end of 2018, Sports Car Leasing purchased approximately 500 vehicles from the Dealerships encompassing 31 separate transactions. (ECF 71-15, Ex.2.) Some of these transactions involved a single vehicle while one involved 111 vehicles. (*Id.*) Yet, none of the first 26 purchases and only three out of the last five purchases have been challenged by Nissan.

34. In or about the Fall of 2018, Cohen approached Heller about an opportunity for Sports Car Leasing to purchase a number of vehicles in bulk. (Pindek Dep., ECF 68-8 at 44:23-45:21; Heller Dep. ECF 68-3 at 17:14.) The offer was attractive to Sports Car Leasing because it could make a profit. (Pindek Dep., ECF 68-8 at p. 46.)

35. Pindek testified that he was told by Heller that the reason the Dealerships wanted to sell the vehicles to Sports Car Leasing between

September and December of 2018 was that the Dealerships needed to meet their manufacturer's quotas. (*Id*. at p. 60.)

36. As of 2018, Heller had known and conducted business with Cohen for about ten years. (SOF ¶ 16.)

37. Later in 2018, separate Dealership employees Jeff Lieber and John Stefanidis called Heller to inform him that they had several additional vehicles that they were looking to sell. (SOF ¶ 17.)

38. At this time, Heller was informed that Cohen no longer was employed by the Dealerships.  (SOF ¶ 18.)

39. When Heller inquired of Cohen's replacement about the reason for Cohen's departure, he was told: "went before me."  (SOF ¶ 19.)

40. On September 18, 2018, November 30, 2018 and December 10, 2018, Sports Car Leasing purchased a total of 79 vehicles (the "Vehicles") from the Dealerships which are the subject of this suit. (Pindek Dep. ECF 68-8 at 76; Ex. 4.) The purchases made on September 18, 2018 were made directly from the Dealerships. The purchases made on November 30, 2018 and December 10, 2018 were made through the intermediary, Sound Motors.

41. Sports Car Leasing also purchased additional lots of vehicles directly from the Dealerships on September 26, 2018 and September 28, 2018 (ECF 71-15, Ex. 2.), similar to the purchases it made on September 18, 2018. It is noteworthy that Nissan did not challenge these two additional purchases.

42. In 2018, the Dealerships sold additional vehicles to two New Jersey wholesalers, Concours Motors, Inc. and 800 E Street, LLC. (ECF 2-10, Exs. G and H.) Although both Concours Motors and 800 E. Street were originally named as Defendants in the New Jersey litigation, the Second Amended Complaint did not name either of these entities as defendants.

43. Heller testified that at the time he purchased the Vehicles on behalf of Sports Car Leasing, he was unaware of any actual or rumored financial difficulties the Dealerships were having. (Heller Dep. ECF 68-3 at pp. 32-33.)

44. Sports Car Leasing did not perform UCC searches for any of the Vehicles sold to it by the Dealerships. (See Sports Car Leasing's Response to Requests for Admissions at ¶ 3 ECF 68-10.)

45. Pindek testified that he did not personally inspect any of the Vehicles prior to purchasing them. (Pindek Dep. ECF 68-8 at 61:14-16.)

46. Sports Car Leasing did not take any steps to determine whether the Vehicles were subject to floor plan financing liens. (SOF ¶ 20.)

47. Pindek testified that Sports Car Leasing did not take any steps to determine if the Vehicles were floor planned because "it's not usually a problem when you pay for a car and receive a title." (Pindek Dep. ECF 68-8 at 78:6-17.)

48. Pindek testified that he was told by Heller that the reason the Vehicles were being sold wholesale was so that the Dealerships could meet

their manufacturer's quotas. Pindek Dep. (ECF 68-8 at 60:11-22.)
Pindek testified that he did not communicate with the Dealerships or
anyone else regarding the reasons why the Vehicles were being sold
wholesale. (*Id*. at 60:23-61:4.)

49. Sports Car Leasing used Sound Motors, a New Jersey entity, as an
intermediary to purchase 34 of the 79 Vehicles MSO-only. (*Id*. at
53:14-20); see also, Sports Car Leasing Spreadsheet, (ECF 68-11.)
Sports Car Leasing claims the reason it did so was because Sports
Car Leasing, as a Pennsylvania entity buying from New Jersey
Dealerships was able to transform the MSOs into titles for a much
lower cost by using a New Jersey entity, Sound Motors.

50. Heller testified that Sports Car Leasing had used Sound Motors as an
intermediary for some of the vehicles it purchased from the
Dealerships prior to September, 2018. (Heller Dep. ECF 68-3 at p. 38.)

51. Pindek, however, testified, that Sports Car Leasing had never used
Sound Motors as an intermediary except for the Vehicles at issue in
this case. Pindek Dep. (ECF 68-8 at p. 59:8-11.)

52. Prior to its purchase of the Vehicles, Sports Car Leasing anticipated
that the Vehicles were held by the Dealerships with MSOs, rather than
regular titles. (See Sports Car Leasing's Response to Requests for
Admissions at ¶ 7 ECF 68-10.)

53. According to Pindek, a regular title is issued with a vehicle when the
vehicle is sold and transferred to somebody's name. Pindek Dep. (ECF

68-8 at 50:5-7.) Pindek testified that without first receiving a regular title, Sports Car would not have been able to resell the Vehicles to a third-party. (*Id*. at 51:5-6.) He further testified that a vehicle bearing an MSO title only can be sold to authorized dealers of that car's make. (*Id*. at 51:8-23.)

54. Sports Car Leasing purchased each of the Vehicles at prices roughly equivalent to the unadjusted MMR value of the respective Vehicle. (See ECF 68-9 at Ex. C; compare ECF 68-9 at Ex. E.)

55. Almost all Vehicles that Sports Car Leasing purchased from the Dealerships had less than fifty miles on their odometers when purchased. (ECF 68-9, Ex. F.)

56. Forty-seven of the Vehicles were from model year 2018; 18 of the Vehicles were from model year 2019; five of the Vehicles were from model year 2017; and one of the Vehicles was from model year 2015. (ECF 68-9, Ex. C.)

57. Even though the Dealerships had financed the Vehicles through NMAC for $2.98 million (about $37,700 per vehicle), Sports Car Leasing (on its own or through Sound Motors) paid the Dealerships only $1,599,500 (about $20,250 per vehicle) for the Vehicles. (ECF 21 at ¶¶ 32,37; ECF 68-9, Ex. C.) Of the 79 Vehicles, 34 of were purchased by Sound Motors in the amount of $919,581.39. (ECF 68-9, Ex. C.) Between November 7, 2018 and December 17, 2018, Sports Car

Leasing sold 42 of the Vehicles to third-party customers through the Manheim auction. (ECF 68-9, Ex. C.)

58. Sports Car Leasing did not buy any of the Vehicles from the Dealerships after Nissan declared the Dealerships in default.

59. On December 18, 2018, NMAC filed the original Complaint and concurrently moved the Court for, among other things, a temporary restraining order and/or preliminary injunction ("TRO") which would prevent Sports Car Leasing from disposing of additional Vehicles. (ECF 1 and 2.)

60. On December 19, 2018, the Court issued a TRO which prevented Sports Car Leasing from selling or otherwise transferring any of the remaining Vehicles. (ECF 6.) Nevertheless, Sports Car Leasing sold an additional thirteen Vehicles through Manheim in January and February 2020. (ECF 68-9, Ex. C; ECF 68-8 at 83:15-21.)

61. On September 19, 2019, the Court issued an Order compelling the sale of the remaining Vehicles. (ECF 49.)  Sports Car sold fourteen of the 23 remaining Vehicles pursuant to the Court's Order. (ECF 68-11.)

62. On November 5, 2019, counsel for NMAC sent counsel for Sports Car Leasing a letter requesting the status and location of the remaining nine Vehicles that were unaccounted for. (See 11/05/19 Letter from Matthew A. Lipman, Esq., ECF 68-13.) NMAC did not receive a response to its request and Sports Car Leasing still has not provided any information regarding the status of the remaining nine Vehicles.

The parties have also submitted expert reports. Nissan's expert, Randall Thorp ("Thorp"), is an automotive professional who has for more than four decades operated automobile dealerships and used car operations in several states across America. (ECF 68-12, Ex. A, p. 6.) Thorp has 20 years of auction experience. (*Id*.) In 2016, as a Corporate Used Car Director, he was responsible for the wholesale of over 10,000 vehicles at Mannheim auctions in five states. (*Id*.)

Thorp opines that Sports Car Leasing did not use due diligence in seeking information as to liens on the inventory of the Dealerships. (*Id*. at p.8.)  Specifically, Thorp opines that "[i]t should have been a red flag to Mr. Pindek because a new car dealer was willing to sell its inventory at a fire sale price of less than one third of what the dealer paid." (*Id*.) Thorp states that regarding due diligence when purchasing used vehicles, "dealers frequently consult title search companies like AutoCheck and Carfax. These services notify the purchaser of title history on the vehicle and issues like lien holder information, state of origin, mileage discrepancy, flood damage, accidents, lemon law and other issues that can affect the value of the vehicle." (*Id*.) Thorp further explains that "[i]n my experience it is buyer beware and every transaction especially one this large, he would have taken a first, a second even a third look before moving ahead considering Mr. Pindek borrowed money to make the deal as he testified on page 70." (*Id*. at 8-9.)

Thorp opines that "Sports Car Leasing knew something was wrong with this transaction." (*Id*. at 9*.)* He bases his opinion on: 1) after the Vehicles were converted

from MSOs into New Jersey titles, the vehicles became, in his opinion, worth less than if they had been left on the MSO, yet 26 of the vehicles were bought at the Auction by new Nissan and Infiniti dealers; 2) the Vehicles were sold during the months of November and December which, according to Thorp, are the very worst months for selling used cars. Thorp states that the Vehicles were sold during these months so that Nissan would not find out; 3) the vast majority of the Vehicles had less than 50 miles on the odometer and that the vast majority of the Vehicles were sold on Mannheim's Online View Exchange at a fixed price of average MMR value between 96.3% and 116% of average MMR. Thorp opines that the sale price of the vehicles was so good that they were sold the same day they were registered for sale; 4) a person doing business everyday in the market would have known the Dealerships were having issues which should have raised suspicions with the transactions. (*Id*. at pp. 9-10.)

According to Thorp, the $1,599,500 that Sports Car Leasing paid for the Vehicles (to both the Dealerships and to Sound Motors) reflected the unadjusted MMR value of the Vehicles and was vastly lower than the MSO value of the Vehicles. (*Id*. at p.3.) Thorp further stated that if Sports Car Leasing had kept the Vehicles on the original MSOs and sold them to authorized dealers as new cars, Sports Car Leasing would have received an amount much closer to MSRP value for the Vehicles. (*Id*.)

Thorp stated that in his four decades in the automotive industry, he has never heard of nor witnessed wholesalers buying new car inventory. (*Id*. at p. 10.) Although Thorpe stated that dealers do "punch" or "RDR" cars from time to time in order to meet factory performance reward programs, they do not wholesale such cars. (*Id*.) Rather,

dealerships move the punched cars to the used car department and sell them at used car prices to a retail customer. (*Id.*)

Sports Car Leasing's expert, Michael P. Fleischer, Sr., (Fleischer") has worked in the automobile industry since 1995, including for approximately nine years as the Finance Manager for Eisenhauer Nissan and six years as General Sales manager for Eisenhauer Nissan. (ECF 71-3, Ex. A at p. 7.) According to Fleischer, during his time as General Sales Manager for Eisenhauer Nissan, there was "very intense pressure" to meet Nissan's monthly quotas (*Id.* at p. 9) and that it was "extremely difficult" to meet Nissan's quotas "with retail sales alone." (*Id.*) According to Fleischer, it was "necessary to sell our cars at very low prices, with little or no profit margin, and very often at a loss, in order to meet our quota." (*Id.*) In some cases, Fleischer sold large volumes of cars to Enterprise Rental at a significant loss just so Eisenhauer Nissan could earn the incentive compensation paid by Nissan for meeting the monthly quota. (*Id.*) According to Fleischer, Nissan did not care what price Eisenhauer sold vehicles for as long as Eisenhauer met its floor plan obligations. (*Id.*)

Fleischer goes on to state that "[o]nce a car is titled [or punched] it is technically deemed a used car no matter how many miles are on the car. The number of miles on the vehicle does not matter. It cannot be re-sold as a new vehicle. It is less valuable than a vehicle that has never had a title issued." (*Id.* at 10.) Fleischer also states that "[o]nce a car is titled, all manufacturer's rebates are no longer available to the customer and the vehicle warranty begins to run." (*Id.*)

In conclusion, Fleischer opined that the purchase of the Vehicles by Sports Car Leasing was in the ordinary course of business. (*Id.* at 13.) According to Fleischer, "[w]holesalers perform a service to benefit dealerships, including these Dealerships, to move excess inventory to meet sales targets." (*Id.*) Fleischer observed that over the course of two years, Sports Car Leasing bought several packages of vehicles from the Dealerships, based on contacts from the Dealerships and with prices (based on MMR) set by the Dealerships. Fleischer noted that in 2017, "Sports Car re-sold vehicles it bought from the Dealerships at wholesale prices with the actual knowledge of NMAC/NNA who did not send any notice or complain to Sports Car or the Dealerships. Sports Car paid for the cars at the time it brought them and would not control whether or not the Dealerships paid money to NMAC. It resold them at auction at a small profit which proves that the amount paid by Sports Car was fair market value. Sports Car did not buy cars from the Dealerships after being put on notice that the Dealerships had not paid their floor plan obligations to NMAC." (*Id.*)

Nissan first argues that it is entitled to summary judgment on Counts II (declaratory judgment) and III (conversion) of the Amended Complaint because Nissan maintains superior possessory rights in the Vehicles through properly perfected purchase-money security interests.

Under Pennsylvania law, conversion is defined as the deprivation without permission of a plaintiff's right to a chattel. *Chrysler Credit Corp. v. Smith*, 643 A.2d 1098, 1100 (Pa. 4 Super. Ct. 1994). Pennsylvania law further recognizes money as a permissible subject of conversion. *Francis J. Bernhardt, III, P.C. v. Needleman*, 705

A.2d 875, 878 (Pa. Super. Ct. 1997) (imposing conversion liability on a law firm's failure to remit settlement proceeds)

Nissan argues that the titles to the Vehicles which Sports Car Leasing received from the Dealerships (and Sound Motors) were void which automatically rendered the sale of the Vehicles a nullity and therefore Sports Car Leasing converted the Vehicles. Sports Car Leasing responds that it received not void but voidable titles from the Dealerships and therefore the titles to the Vehicles would be allowed to pass to Sports Car Leasing as long as Sports Car Leasing purchased the Vehicles in good faith and in the ordinary course of business.

Under Pennsylvania law, "[I]n order to possess voidable title, one must obtain goods through the assent of the original owner, but not necessarily acquire good title." *Empire Fire and Marine Insurance Co. v. Banc Auto, Inc.* 897 A.2d 1247, 1250 (Pa. Super. 2006) citing *In re Hennessy* 494 A. 2d 853, 856 (Pa. Super.1985). "Void title, on the other hand, derives from a situation where the goods were not obtained through the assent of the original owner." *Id.* "In common application, this means if goods are stolen and resold, no good title can be transferred because the thief has never had proper title to the goods and so cannot pass good title to another. However, if the goods are obtained through the consent of the original owner, even though that original owner may have been fraudulently induced to part with the goods, title is merely voidable and a buyer in good faith may still obtain title to the goods." *Empire*, *supra*.

The Uniform Commercial Code, as adopted in Pennsylvania, further describes the passing of title: "Unless  otherwise  explicitly  agreed  title  passes  to  the  buyer  at the  time and place at which the seller completes his performance with reference  to  the

physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time and place, and in particular and despite any reservation of a security interest by the bill of lading."

13 Pa.C.S. § 2401(2).

The power of transfer and entrustment are addressed in Section 2403 of the UCC. The full text of the section is as follows:

> Power to transfer; good faith purchase of goods; "entrusting".
>
> (a) **Transfer of title**. --A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased.    A person with voidable title has power to transfer a good title to a good faith purchaser for value.    When goods have been delivered under a transaction of purchase the purchaser has such power even though:
>
> (1) the transferor was deceived as to the identity of the purchaser;
>
> (2) the delivery was in exchange for a check which is later dishonored;
>
> (3) it was agreed that the transaction was to be a "cash sale"; or
>
> (4) the delivery was procured through fraud punishable as larcenous under the criminal law.
>
> (b) **Transfer by merchant entrusted with possession of goods**.--Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business.
>
> (c) **Definition of "entrusting"**.--"Entrusting" includes any delivery and any acquiescence in retention of possession

> regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the disposition of the goods by the possessor has been such as to be larcenous under the criminal law.

13 Pa.C.S. § 2403.

Based on this authority, once Nissan voluntarily delivered and entrusted the Vehicles to the Dealerships (which obviously deal in selling Nissan vehicles) and acquiesced in the Dealerships' retention of possession of the vehicles (indeed, the WSAs between Nissan and the Dealerships specified the location of the cars), the Dealerships obtained the titles to the Vehicles, despite not having any document of title and despite any reservation of a security interest by Nissan. The Dealerships were thereafter free to sell the Vehicles to a buyer in good faith. As a result, all of the titles Sports Car Leasing received were voidable, but not void.

We now turn to the effect of Nissan's entrustment, specifically that provided in 13 Pa.C.S. § 2403(b). The plain language of this subsection establishes that upon entrustment, the Dealerships, as merchants who deal in goods of that kind (cars), had the power to transfer the rights of the entruster (Nissan) to a buyer in the ordinary course of business.

Under Pennsylvania's version of the UCC, the term "buyer in the ordinary course of business" is defined, in pertinent part, as follows:

> A person that buys goods in good faith, without knowledge that the sale violated the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. . .

> (i)  A person buys goods in the ordinary course of business if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged **or with the seller's own usual or customary practices.**

13 Pa.C.S. § 1201(9)(i)(emphasis added.)

The UCC specifically defines the term "knowledge" as meaning "**actual** knowledge." See 13 Pa. C.S.A.§ 1202(b) (emphasis added). By contrast, the UCC states that a person has "Notice" of a fact if the person: (1) has actual knowledge of it; (2) has received a notice or notification of it; or (3) from all the facts and circumstances known to the person at the time in question, has reason to know that it exists. " See 13 Pa.C.S. § 1202(a). Thus, despite Nissan's arguments to the contrary, the term "knowledge" as used in Pennsylvania's version of the UCC is limited to actual or subjective knowledge and does not include constructive knowledge or suspicion. If the UCC meant otherwise, it easily could have defined "knowledge" in the same manner it defined "notice." See also *KDG Auto Sales, Inc. v. Asta Funding, Inc.*, 781 A.2d 202, 204 fn 3 (Pa. Super. 2001), (Section 1201 "prohibits a buyer in the ordinary course from having **actual** knowledge that the sale is in violation of a security interest of a third party.") (emphasis added.)

However, a buyer is still acting in the ordinary course of business even if the buyer knows of the existence of a perfected security interest. See 13 Pa.C.S. § 9307(a) ("A buyer in the ordinary course of business…takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.") Therefore, in order to not be considered a buyer in the ordinary course of business, the buyer must not only have actual knowledge of a security interest

in the goods by a third party, but must also have actual knowledge that the proposed sale to that buyer is in violation of the third party's security interest. 13 Pa.C.S. § 1201(9) See also *Key Corporate Capital, Inc. v. Tilley*, 2006 WL 487936 at *2 (E.D. Pa. Feb. 27, 2006), *aff'd.*,*Key Corporate Capital, Inc v. Tilley*, 216 Fed. Appx. 193, 195-96 (3d Cir. 2007).

Here, there is no evidence in the record that Sports Car Leasing **actually** knew at the time it purchased Vehicles from the Dealerships that any of the Vehicles were either subject to a security interest by Nissan (even if it suspected as much) **and more importantly**, **actually** knew that the Dealerships were violating Nissan's security interest in the Vehicles by selling the Vehicles to Sports Car Leasing out of trust. Most significantly, it is undisputed that none of the Vehicles were purchased by Sports Car Leasing from the Dealerships after Nissan had declared the Dealerships to be in default.

The Dealerships' sale of the Vehicles also comported with the Dealerships' own usual or customary practices. The record reveals that the Dealerships had been selling cars wholesale to Sports Car Leasing for almost two years, beginning on January 27, 2017 until Nissan raised an issue about the lot sold on September 18, 2018. Besides Sports Car Leasing, the Dealerships also sold vehicles in 2018, to two New Jersey wholesalers, Concours Motors, Inc. and 800 E Street, LLC. (ECF 2-10, Exs. G and H.) Moreover, Fleischer confirmed that dealerships will sell vehicles wholesale as a way to meet stringent manufacturer's quotas. And Pindek testified that Sports Car Leasing buys 90-95 percent of its vehicles from dealerships. (Pindek Dep. ECF 68-8 at 17-18; Heller Dep. ECF 68-3 at 26.)

Being a buyer in the ordinary course of business also requires the buyer to have acted in good faith. The Pennsylvania version of the UCC defines "Good faith" as "[h]onesty  in  fact  and the observance of reasonable commercial standards of fair dealing."  13 Pa.C.S. § 1201(20). The definition of "honesty in fact" must also be viewed subjectively. *Hartford Accident Indemnity Company v. First Pennsylvania Bank, Nat'l Ass'n*., 859 F. 2d 295, 297 (3d Cir. 1988).

Pindek testified (and Heller confirmed) that over the past ten years, Sports Car Leasing has purchased 90 to 95 percent of its vehicles from dealerships. (Pindek Dep. ECF 68-8 at 17-18; Heller Dep. ECF 68-3 at 26.) Indeed, Heller testified that Sports Car Leasing will sometimes purchase anywhere from one, five, ten or "whatever they have to sell" vehicles from dealerships. (ECF 68-8 at 28.) Pindek further testified that dealerships sometimes need to sell vehicles in groups in order to meet the manufacturer's quota. (ECF 68-3 at 31.) Fleischer confirmed this in his expert report. According to Fleischer, during his time as General Sales Manager for Eisenhauer Nissan, there was "very intense pressure" to meet Nissan's monthly quota. (ECF 71-3 at 9.) and that it was "extremely difficult" to meet Nissan's quotas "with retail sales alone." (*Id*.) Fleischer opined that "[w]holesalers perform a service to benefit dealerships, including these Dealerships, to move excess inventory to meet sales targets." (*Id.* at 13.) And Pindek testified that he was told by Heller that the reason the Dealerships wanted to sell the Vehicles was because the Dealerships needed to meet their manufacturer's quotas. (ECF 68-8 at 60.) So at least from Sports Car Leasing's point of view, there was nothing unusual about Sports Car Leasing making wholesale purchases from the Dealerships.

The record further reveals that Cohen and Heller had known and conducted business with each other for about 10 years. In fact, prior to purchasing the Vehicles in three lots from the Dealerships from September through December of 2018, Sports Car Leasing had already purchased similar vehicles from the Dealerships as far back as January 27, 2017 at wholesale prices in lots as small as one and as large as 111.  (*Id*. at 43, 45; ECF 71-15, Ex. 2.) Indeed, Sports Car Leasing made 31 separate purchases of lots of vehicles from the Dealerships between January 27, 2017 and December 10, 2018. (ECF 71-15, Ex. 2.) Sports Car Leasing even purchased lots of similar vehicles from the Dealerships on September 26, 2018 and September 28, 2018 which was **after** Sports Car Leasing's first purchase of the Vehicles that are the subject of this litigation on September 18, 2018. (*Id*.) Yet, Nissan never complained that these two September, 2018 purchases nor any of the other numerous purchases by Sports Car Leasing of Dealership vehicles that began on January 27, 2017 violated Nissan's security interests in those vehicles.

Although Nissan points out with respect to the Vehicles, Sports Car Leasing did not perform a U.C.C. search with the Office of the Secretary of the Commonwealth to determine whether Nissan had a first priority lien on the vehicles, did not check with Nissan to see if the Vehicles were subject to floor plan financing and did not conduct any personal inspections of any of the Vehicles, there is no evidence in the record that Sports Car Leasing had ever taken any of these actions on the previous 28 occasions it purchased vehicles from the Dealerships beginning on January 27, 2017.  The record seems to be that Sports Car Leasing operated as it always did in the past.  Again, there were no documented complaints by Nissan as to all these prior purchases. As a result,

there is nothing in the record or the history of their transactions that should have caused Sports Car Leasing to be suspicious of the sale of the Vehicles by the Dealerships on just the three occasions that are the subject of this litigation as opposed to the myriad of prior similar transactions between the parties. Obviously, Sports Car Leasing had developed a relationship with the Dealerships over almost two years based on trust and Sports Car Leasing did not believe it was necessary to perform U.C.C. searches or personal inspections of the Vehicles. The Court concludes that Sports Car Leasing has met all the requirements for being a buyer in the ordinary course of business as that term is defined in Pa.C.S.§ 1201 and that it received good title to the Vehicles.

As a result, Nissan's security interest in the cars was discontinued upon their sale to good faith buyer Sports Car Leasing in the ordinary course of business,13 Pa.C.S. §  2403(b), and Sports Car Leasing cannot be liable to Nissan for conversion or replevin.  There may be other parties responsible to Nissan for what happened here but there is no legal remedy for redress as to this particular Defendant.